IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CV-180-F

| | |
|---|---|
| SAUER INCORPORATED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **ORDER** |
| LEXINGTON INSURANCE AGENCY INC. ) | |
| D/B/A LEXINGTON INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on cross motions for summary judgement filed by Plaintiff Sauer Incorporated ("Sauer") [DE-86], and Defendant Lexington Insurance Agency Inc. ("Lexington") [DE-89]. The matters have been fully briefed and are ripe for ruling. For the reasons set forth herein, both motions are DENIED.

I. STATEMENT OF THE FACTS

The basic facts are not in dispute. Sauer was general contractor for a storm water retention system project (the "Rain Tank") at Fort Bragg. The Rain Tank eventually collapsed after installation. Lexington issued an insurance policy to Sauer that provided certain coverage for the project. Lexington denied coverage for the Rain Tank collapse, and Sauer brought suit.

A. The Rain Tank Installation and Collapse

The Rain Tank was composed of plastic crate-like modules, manufactured by a company called ACF. The modules, when assembled and installed, form a honeycomb structure tank that retains water underground.

Sauer subcontracted with a company called Benson Construction, Inc. ("Benson"), to assemble and install the Rain Tank. An engineering firm, Burns & McDonnell, was responsible for hydraulically sizing the Rain Tank and choosing a suitable location based on the site constraints. *See* Klingele Deposition [DE-90-3] 25:13-21. Once completed, the Rain Tank was covered with between seven to thirteen feet of soil fill, depending on the gradient of the land above it.

Sometime shortly after the Rain Tank was completed, the Old North Utility Services, Inc. ("ONUS") installed a water line above the Rain Tank. The water line project was completely separate from the Rain Tank contract, and Sauer was not involved in the water line installation. The water line construction involved heavy equipment, including a large crane. However, the exact travel paths of the equipment over the Rain Tank are unclear.

At some point after the water line installation, the ground above the Rain Tank began to show signs of cracking. A sinkhole formed above the center of the Rain Tank, and the Rain Tank was unearthed to evaluate the damage. While Lexington classifies the damage to the Rain Tank as a "failure," it is clear that the Rain Tank had begun to collapse. What is not clear, and what the parties heavily dispute, is what exactly caused the collapse.

### B. The Cause of the Collapse

After the Rain Tank collapse, Lexington assigned EDT to investigate the collapse. EDT provided a report concluding (1) that the materials used in the Rain Tank did not have the load-bearing capacity necessary for the plan; and (2) that the depth of the Rain Tank contributed to the collapse because of the load on top of the tank. *See* EDT Report, Exhibit B to Sauer's Memorandum of Law in Support of Renewed Motion for Summary Judgment [DE-87-5] at 17,

2

Case 5:13-cv-00180-F   Document 106   Filed 09/14/15   Page 2 of 11

¶¶ 2-3. The EDT Report also noted that "[o]ther factors," including the construction activities that occurred above the Rain Tank, may have caused the collapse. *See id.* ¶ 5.

Sauer similarly requested a report and technical memorandum from S&ME to address the collapse. *See* S&ME Report, Ex. E Sauer's Mem. Law Supp. Renewed Mot. Summ. J. [DE-87-8] ("S&ME Report"). The S&ME Report concluded, based on the EDT report, that the materials used in constructing the Rain Tank were defective. *Id.* at 3.[1] The S&ME report also opined that the construction methodology was the "primary, and possibly the sole, cause of the observed failure of the Rain Tank system." *Id.*[2] The S&ME Report stated that the equipment traffic would have had a "minor, but possibly significant contribution to the" collapse, while the "water line trench excavation and spoil pile construction methodology was the primary, and possibly the sole, cause of the" collapse. S&ME Report [DE-87-8] at 2-3.

The various parties involved in the Rain Tank construction have not been able to decisively determine what caused the collapse. As noted above, the reports commissioned by Sauer and Lexington note that various factors may have caused the collapse. Furthermore, when Sauer engaged in discussions about replacing the collapsed Rain Tank, it did not know the cause of the collapse. *See* Haag Dep. [DE-90-1] 136:23-137:8, 139:20-21. Indeed, Sauer's project manager stated that, although he believed that replacing the plastic Rain Tank with a concrete rain tank would be safer, he did not know "exactly the cause of . . . the collapse of the tank." *See id.* 131:3-10. In a letter regarding the incident, he further stated that Sauer had no evidence of improper installation and that the amount of backfill did not exceed the manufacturer's instructions for installation. *See* Letter of May 12, 2011, from Charles Haag to Frank Roberts

---

[1] S&ME expressed its concerns regarding EDT's testing methodology, but noted that the results, if accurate, would indicate that the materials used were defective. *See id.*

[2] Lexington admits this statement of fact. *See* Lexington's Response in Opposition to Sauer's Motion for Summary Judgment [DE-94] at 7.

3

[DE-90-8] at 3. ACF, the manufacturer of the Rain Tank modules, also believed the Rain Tank had been installed properly. *See* DiLoreto Dep. [DE-90-2] 22:5-8.

Other parties believed that the Rain Tank should have been fine as installed. The lead civil engineer from Burns & McDonnell, the engineering firm that provided volume and location specifications for the Rain Tank, stated that he did not have concerns regarding the Rain Tank modules or their manufacturer and that he did not know whether the design caused the collapse. *See* Klingele Dep. [DE-90-3] 85:10-86:19. Moreover, he said that his firm could not conclusively determine what caused the collapse. *See id.* Otherwise he had not doubts as to the Rain Tank's suitability for the Fort Bragg project. *See id.* at 99:9-11. Sauer's expert opined that the exact cause of the Rain Tank failure was not known, other than that the water line installation precipitated the collapse. *See* Ulmer Dep. [DE-90-9] 30:6-15. He also stated that the designs for the tank appeared to meet the standard of care. *See id.* at 66:22-67:14.[3] A representative from Benson, the subcontractor, believed that Benson had installed the Rain Tank "as specified in accordance with the plans and specs," and that the collapse was due to the heavy equipment that had been on top of the Rain Tank area. *See* Roberts Dep. [DE-90-10] 22:14-25. These opinions indicate that that the weight placed upon the Rain Tank during the water line installation precipitated the collapse, but do not indicate whether the design, the materials, or the Rain Tank installation methods were the actual underlying cause.

---

[3] Lexington contends that Sauer's expert withdrew his opinion that the Rain Tank design met the standard of care. However, after a review of the expert's deposition, the court finds that the expert did not withdraw his opinion that the *design* met the standard of care. *See id.* The expert reviewed the tank designs believing that Burns & McDonnell, the company that specified the hydraulic capacity and location of the tank, had also designed the tank. The expert concluded, based on a review of the designs, that Burns & McDonnell *and* the designs met the standard of care. However, once he became aware that Burns & McDonnell had not done the actual design work, it was no longer their standard of care to meet. That is, it appears the expert withdrew his opinion only as to whether *Burns & McDonnell* had met the standard of care, not as to whether the *designs* met the standard of care.

4

While many parties believed the plastic Rain Tank to be suitable for the job, all of the potential replacement designs included either additional support panels or the use of concrete, both of which would have provided additional support to protect against another collapse. *See, e.g., id.* at 47:3-48:22. Moreover, a representative from ACF stated that, had he known that construction traffic was to pass over the Rain Tank, he personally would have designed a different system. *See* DiLoreto Dep. [DE-90-2] 52:2-7. He also typically recommended constructing rain tanks after any adjoining buildings had already been constructed to minimize vehicles driving over it. *See id.* at 26:10-16. Other parties expressed concern regarding the amount of soil placed on top of the Rain Tank. *See, e.g.*, Haag Dep. [90-1] 137:3-11.

The cause of the collapse is germane to the present dispute. Determining what caused the collapse likely determines whether the policy provides coverage for the loss.

### C. The Policy Coverage

While the Policy provided general coverage for Sauer's projects at Fort Bragg, including the Rain Tank installation, certain exclusions and additional coverage provisions are particularly relevant to the present dispute. The relevant contract provisions include (1) an exclusion for faulty, inadequate or defective design or workmanship; (2) additional coverage for collapse (the "Collapse Provision"); and (3) the definition of "Building Under Construction." *See* Ex. A Sauer's Mem. Law Supp. Renewed Mot. Summ. J. [DE-87-4] at 21, 24, 26 (the "Policy").

The exclusion provision states that the policy will, in part, not cover any loss or damage resulting from faulty, inadequate or defective design or workmanship. *See* Policy [DE-87-4] at 21. However, the policy also contains a Collapse Provision, which provides additional coverage in the event of a collapse "of a building or any part of a building" if caused by certain conditions, including "[w]eight of people or personal property" and the "[u]se of defective material or

5

methods in construction, remodeling or renovation if the collapse occurs during the course of construction." *See id.* at 24. While the Collapse Provision does not directly define "building" or "part of a building," the "Builders Risk Coverage Form" defines a "Building Under Construction" to include a "building or structure" and "[f]ixtures" if intended to become a permanent part of a building or structure. *See id.* at 26.

\* \* \*

Lexington moves for summary judgment arguing (1) that the Rain Tank is not a "building" or "part of a building" under the Collapse Provision, and (2) that coverage is excluded because the collapse was caused by faulty, inadequate or defective design or workmanship. Sauer moves for summary judgment arguing that the collapse is covered under the Collapse Provision.

## II. LEGAL STANDARD

A party is entitled to summary judgement when the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the court must examine the evidence presented by both parties and determine if there is a need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013). The court examines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). An issue of fact is genuine if a reasonable jury could find for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248. A fact is material if proof of the fact might affect the outcome of the case under the substantive law. *Id.* The facts should be

6

Case 5:13-cv-00180-F Document 106 Filed 09/14/15 Page 6 of 11

viewed in the light most favorable to the nonmoving party. *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996).

This action is before the court pursuant to diversity jurisdiction. Therefore, the court applies North Carolina substantive law. *Harleysville Mut. Ins. Co. v. Reliance Nat'l Ins. Co.*, 256 F. Supp. 2d 413, 417 (M.D.N.C. 2002) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).[4]

## III.  DISCUSSION

Under North Carolina law, the goal of insurance contract construction "is to arrive at the intent of the parties when the policy was issued." *Woods v. Nationwide Mut. Ins. Co.*, 246 S.E.2d 773, 777 (N.C. 1978). The *Woods* court provides the touchstone for disputes where much hangs on the meaning of a only a few words:

> Where a policy defines a term, that definition is to be used. If no definition is given, nontechnical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect. If, however, the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations, the doubts will be resolved against the insurance company and in favor of the policyholder. Whereas, if the meaning of the policy is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein.

*Id.* Moreover, "[i]t is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." *Carolina Power & Light Co. v. Bowman*, 51 S.E.2d 191, 199 (N.C. 1949).

---

[4] Sauer argues, and Lexington does not dispute, that North Carolina law applies. The court agrees. Under North Carolina law, "[a]ll contracts of insurance on property, lives, or interests in this State shall be deemed to be made therein." N.C. Gen. Stat. § 58-3-1. Application of this statute is limited to those "situations where there is a 'close connection' between North Carolina and the interests insured by the policy." *Cont'l Cas. Co. v. Physicians Weight Loss Ctrs. of Am., Inc.*, 61 F. App'x 841, 844-45 (4th Cir. 2003) (quoting *Collins & Aikman Corp. v. Hartford Accident & Indem. Co.*, 436 S.E.2d 243, 246 (N.C. 1993)). The project and subject matter of the insurance policy at issue were in North Carolina, the Rain Tank parts were shipped to and installed in North Carolina, and the collapse occurred in North Carolina. North Carolina law applies.

7

Once the meaning of a policy has been established, the plaintiff bears the initial burden of "bringing itself within the insuring language of the policy." *Hobson Constr. Co., Inc. v. Great Am. Ins. Co.*, 322 S.E.2d 632, 635 (N.C. Ct. App. 1984). Once established, that burden then "shifts to the insuror to prove that a policy exclusion excepts the particular injury from coverage." *See id.* (citing *Nationwide Mut. Ins. Co. v. Allen*, 314 S.E.2d 552, 554 (N.C. Ct. App. 1984)).

North Carolina law favors liberal construction of insurance policies "so as to provide coverage, whenever possible by reasonable construction." *State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 350 S.E.2d 66, 68 (N.C. 1986).[5] Additionally, the Supreme Court of North Carolina has held that "that provisions which exclude liability of insurance companies are not favored and therefore all ambiguous provisions will be construed against the insurer and in favor of the insured." *Id.* Put in other terms, "[e]xclusionary clauses are interpreted narrowly while coverage clauses are interpreted broadly to provide the greatest possible protection to the insured." *Id.* at 71.

The Supreme Court of North Carolina has further held that, "[a]s a general rule, coverage will extend when damage results from more than one cause even though one of the causes is specifically excluded." *Avis v. Hartford Fire Ins. Co.*, 195 S.E.2d 545, 549 (N.C. 1973). That is, "the sources of liability which are excluded from . . . policy coverage must be the *sole cause* of the injury in order to exclude coverage under the policy." *State Capital Ins.*, 350 S.E.2d at 73 (emphasis added). Moreover, where general provisions conflict with specific provisions in the

---

[5] While courts have often applied these rules in cases involving homeowners insurance policies, they have also been applied in cases involving commercial insurance policies. *See, e.g., Builders Mut. Ins. Co. v. N. Main Constr., Ltd.*, 625 S.E.2d 622, 624-25 (N.C. Ct. App. 2006) (applying the same principals to commercial insurance policy and an automobile exception). The same principles apply here.

8

same contract, the general provisions should give way to the specifics. *See Dev. Enters. of Raleigh v. Ortiz*, 356 S.E.2d 922, 924 (N.C. Ct. App. 1987).

Here, there are two issues that the court must evaluate. First, the court must determine whether the collapse was caused solely by faulty, inadequate or defective design or workmanship as excluded by the Policy, or whether the collapse was caused, in whole or in part, by conditions listed in the Collapse Provision. *See* Policy [DE-87-4] at 21, 24. In short, the court must determine whether there is no genuine issue of material fact as to what caused the collapse. If the court cannot reach that determination, then summary judgment must be denied as to both parties. Second, if the court finds that the collapse was caused in whole or in part by a condition covered under the Collapse Provision, the court must then determine whether the Rain Tank was a "building or any part of a building." *See id.* at 24.

## A. The Cause of the Collapse

The Policy states that it will not cover any loss or damage resulting from faulty, inadequate or defective design or workmanship. *See id.* at 21. However, under the principles of contract interpretation enumerated above, "coverage will extend when damage results from more than one cause even though one of the causes is specifically excluded." *Avis*, 195 S.E.2d at 549. Therefore, as long as the collapse resulted from some condition covered by the Policy, coverage will extend to the loss despite the exclusion.

Under the Collapse Provision, coverage will not extend to any collapse, but only to those collapses caused by one or more of the listed conditions. *See id.* at 24. Those conditions include the "[w]eight of people or personal property" and the "[u]se of defective material or methods in construction . . . if the collapse occurs during the course of construction." *Id.* If the undisputed

9

facts indicate that one of these conditions is met, then the Policy provides coverage so long as the Rain Tank was a "building or . . . part of a building." *Id.*

Here, the facts are heavily disputed, particularly as to the cause of the collapse. The court has reviewed all of the parties' submissions and cannot determine, based on those submissions, that the collapse was either (1) caused only by faulty, inadequate or defective design or workmanship; or (2) caused at least in part by the "[w]eight of people or personal property" or the "[u]se of defective material or methods in construction, remodeling or renovation . . . during the course of construction." Viewed in the light most favorable to Sauer, the evidence indicates that something beyond defective design or workmanship likely contributed to the collapse. On the other hand, viewed in the light most favorable to Lexington, the evidence does not definitively show that something beyond defective design or workmanship caused the collapse. Indeed, the only common thread in the evidence is that no one seems to know just what caused the collapse. The evidence is not "so one-sided that one party must prevail as a matter of law," but instead "presents a sufficient disagreement to require submission to a jury." *Liberty Lobby*, 477 U.S. at 251-52. A fact-finder is necessary to make a determination on what caused the collapse. Therefore, both Motions for Summary Judgment [DE-86, -89] are DENIED.[6]

## IV. CONCLUSION

For the foregoing reasons, Sauer's Motion for Summary Judgement [DE-86] is DENIED. Lexington's Motion for Summary Judgment [DE-89] is also DENIED. The Clerk of Court is DIRECTED to set this case for trial at least ninety (90) days after entry of this order.

---

[6] Because the court cannot determine the cause of the collapse, the court does not reach the question of whether the Rain Tank was a "building" or "part of a building" under the Collapse Provision.

10

Case 5:13-cv-00180-F   Document 106   Filed 09/14/15   Page 10 of 11

SO ORDERED.

This, the 14'th day of September, 2015.

*James C. Fox*
JAMES C. FOX
Senior United States District Judge